IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA,   :
                                  :

v.                              :      CRIMINAL INDICTMENT NO.:
                                  :      2:19-CR-00044-RWS-JCF

RALPH HAYWOOD JONES, JR.   :

## ORDER and REPORT AND RECOMMENDATION

This case is before the Court on Defendant's Motion To Dismiss Count Two Of The Indictment (Doc. 28) and Motion To Suppress (Doc. 41). For the reasons discussed below, it is **RECOMMENDED** that Defendant's motion to dismiss Count Two (Doc. 28) be **GRANTED** and that his motion to suppress be **DENIED**.

## Procedural History

A Superseding Indictment filed December 17, 2019 (Doc. 14) charges Defendant with kidnapping "B.P." from Georgia to South Carolina on June 10, 2019, in violation of 18 U.S.C. § 1201 (Count One) and possessing a firearm in furtherance of a crime of violence, i.e., kidnapping, and discharging the firearm during the commission of the kidnapping, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Two). Defendant moved to dismiss Count Two (Doc. 28) and moved to suppress evidence seized by law enforcement officers as a result of "pinging" Defendant's cell phone without a warrant, evidence seized pursuant to search warrants, and Defendants' statements to law enforcement (Doc. 41). The Court conducted a hearing on Defendant's motion to suppress on April 16, 2021 (*see* Doc. 51), and the

1

transcript was filed on May 11, 2021 (Doc. 58).[1]  Defendant filed a post-hearing brief in support of his motion to suppress (Doc. 62); the Government responded to Defendant's motions to suppress and to dismiss (Doc. 65); and Defendant replied (Doc. 66).  With briefing complete, the Court now considers the merits of Defendant's motions.

## Discussion

### I.     Motion To Dismiss Count Two (Doc. 28)

Count Two charges Defendant with possessing a firearm in furtherance of a crime of violence, i.e., kidnapping in violation of 18 U.S.C. § 1201, in violation of 18 U.S.C. § 924(c)(1)(A). (Doc. 14 at Count Two). Defendant argues that that Count must be dismissed because in *United States v. Gillis*, 938 F.3d 1181, 1210 (11th Cir. 2019), the Eleventh Circuit held that kidnapping in violation of 18 U.S.C. § 1201 is not a "crime of violence" for purposes of 18 U.S.C. § 924(c). (*See generally* Doc. 28). Citing *Gillis*, the Government "concedes that count two of the Superseding Indictment should be dismissed per binding Eleventh Circuit," which provides that kidnapping in violation of 18 U.S.C § 1201 is not a "crime of violence" because "parts of the federal kidnapping statute did not require an element of force to be considered a 'crime of violence.' " (Doc. 65 at 1, 8-9). It is therefore

---

[1] References to the transcript will be designated as "Tr. __."

**RECOMMENDED** that Defendant's motion to dismiss Count Two (Doc. 28) be **GRANTED**.

## II.    Motion To Suppress (Doc. 41)

### A.    Facts[2]

At 10:15 a.m. on June 10, 2019, Chris Compton, who was then a Patrol Officer with the Winder Police Department[3], responded to a 911 call about a shooting on Sweet Gum Lane in Winder.[4] (Tr. 8-9). Compton arrived within two to three minutes and saw a woman, later identified as Destiny Jarrell (*see* Tr. 21), lying in the front yard of the residence with at least one gunshot wound to her abdomen. (Tr. 9, 15). There was a lot of blood, and the woman was saying, "Please don't let me die, I've got kids." (Tr. 9). Officer Daniel Evans and other officers also arrived, and an ambulance was on the scene as well. (Tr. 9-10). Compton approached the woman to determine how severe her injuries were, and once Compton and Evans determined the scene was safe, they allowed the ambulance to come in and then secured a perimeter for the crime scene. (Tr. 10). After establishing the perimeter, Compton

---

[2] These facts are taken from the testimony of Chris Compton, formerly employed as a patrol officer with the Winder Police Department; Wayne Manthe, a detective with the Winder Police Department; Justin Pelfrey, a sergeant with the Oconee County, South Carolina, Sheriff's Office; and hearing exhibit (*see* Docs. 52, 54), including a CD of 911 calls (Gov't Ex. 2), a CD of telephone calls with Cavender Auto (Gov't Ex. 4), and a CD of body cam footage (Gov't Ex. 6) and transcript of the body cam footage (Gov't Ex. 7 (*see* Doc. 56).

[3] Compton is now a Corporal with the Flowery Branch Police Department. (Tr. 8).

[4] The Government entered a CD of the relevant 911 calls into evidence at the hearing and played the CD during the hearing. (Tr. 19-20; Gov't Ex. 2).

spoke to witnesses on the scene, and one witness told him that he saw a black man in a dark-colored shirt run around to the passenger side of a nearby dark sedan, toss something in the back of the car, run back around to the driver's side, enter the vehicle, and then flee the scene. (Tr. 10-11, 16-17). Ms. Jarrell said that a black male named Ralph Jones, i.e., Defendant, shot her and that a woman, later identified as Bridget Pounds (*see* Tr. 15, 18, 21-22), left with him and was "possibly somebody involved in a custody dispute or something like that." (Tr. 11-12, 15). Ms. Jarrell was there to "mediate some type of a custody issue." (Tr. 12). The officers did not find a firearm on the scene or locate Ms. Pounds there. (Tr. 12).

Winder Police Department Detective Wayne Manthe also responded to the scene that day in response to the 911 calls. (Tr. 21). He was able to develop Defendant as a suspect by searching a database for the residence where the shooting occurred. (Tr. 21). The police had "some prior reports dealing with all the subjects" and knew that Defendant was Ms. Pounds' boyfriend. (Tr. 21-22). They began "trying to develop phone numbers to ping him, ping the phone" by using the phone numbers associated with his Georgia driver's license and Winder Police Department incident reports involving Defendant and Ms. Pounds such as domestic reports and arrest reports. (Tr. 22-23, 26-27). They also tried to "ping" phone numbers associated with Ms. Pounds because they "had reason to believe that her life was in danger," but they were not able to locate her based on her phone. (Tr. 23-24, 28). Manthe explained that they "pinged" the numbers by having dispatch request the

4

cell phone carriers provide a location for the phones, and "[t]he carrier has a law enforcement division that . . . ascertains whether or not they will follow through with that request based off their protocol and their thresholds for what is an emergency and if it's necessary."[5] (Tr. 23, 27). They had "nothing else to go on" because they did not have information about where the car was going, "[s]o it's typically the best course of action to determine the location." (Tr. 22). Dispatch did so, the carriers complied with the requests, and the officers received "scattered" results across multiple locations, but eventually they received locations in Fair Play, South Carolina for a phone number the officers obtained from an April 2019 incident report, 678-863-XXXX. (Tr. 23-24, 27-28, 31). An Exigent Request Form dispatch sent to T-Mobile shows that dispatch requested the name address, and current location ("One-Time Ping") of a particular phone number (not the above-cited number) and indicated that the "exigent circumstances" supporting the request was "[i]mmediate danger of death or serious physical injury to any person," i.e., "subj[ect] has a 9 mm gun with him and has already shot 1 person[,] poss[ibly] has another [or hostage]."[6] (Tr. 29-32; Gov't Ex. 3). Manthe testified it was difficult to

---

[5] The Stored Communications Act authorizes cell phone providers "to divulge information, including real time cell-site location information, 'to a government entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency.'" *United States v. Andrews*, No. 18-CR-149 (SRN/DTS), 2019 U.S. Dist. LEXIS 26283, at *17-18 (D. Minn. Feb. 19, 2019).

[6] The Stored Communications Act authorizes cell phone providers "to divulge information, including real time cell-site location information, 'to a government

determine which carrier was associated with each phone number, so it was "very difficult to attach the location that dispatchers [were] giving [the officers] to which phone number they were giving information from." (Tr. 41). He also explained that there is often a delay in obtaining information from the carriers, and they might not respond until an hour later. (Tr. 51). As of 12:30 p.m., law enforcement was still working on trying to obtain location information from cell phone carriers. (Tr. 43).

Manthe also called the lienholder for Defendant's vehicle because he knew that some dealers have GPS attached to the vehicles. (Tr. 32-33). Manthe identified Defendant's vehicle based on the description included in previous incident reports. (Tr. 33). Once they had a tag number they were able to obtain the make and model and lienholder. (Tr. 33). Manthe called the dealership, Cavender Auto Sales ("Cavender"), at 1:32 p.m., explained the situation, and asked if they could provide the information on the vehicle, including its location.[7] (Tr. 33-34, 39-40). Manthe recorded the call he made to the dealership.[8] (Tr. 34; Gov't Ex. 4). When he made the call to Cavender, Manthe did not know the location of Plaintiff or Ms. Pounds

---

entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency.' " *United States v. Andrews*, No. 18-CR-149 (SRN/DTS), 2019 U.S. Dist. LEXIS 26283, at *17-18 (D. Minn. Feb. 19, 2019) (quoting 18 U.S.C. § 2702(c)(4)).

[7] Manthe does not know whether Defendant knew there was a GPS monitor on his car. (Tr. 49-50).

[8] The Government entered a CD of the recorded phone calls and played it at the hearing. (Tr. 34-36; Gov't Ex. 4).

because the carriers had not yet responded to their location requests. (Tr. 35). The GPS information Manthe received from Cavender helped law enforcement locate the car at a Dollar General on Fairplay Boulevard in Fair Play, South Carolina. (Tr. 51; Gov't Ex. 5). After that call, Manthe received information from dispatch that AT&T[9] responded that a phone associated with Defendant was in Fair Play, South Carolina, so Manthe called Cavender at 1:44 p.m. to confirm that the car was still there. (Tr. 39-41). Manthe also recorded that call. (Tr. 35-36; Gov't Ex. 4).

Manthe described the events of that morning as "chaotic" with respect to trying to determine Defendant's location based on the multiple locations they were receiving from the cell phone carriers, and the officers were employing multiple methods simultaneously to try to get information as to Defendant's location, including trying to get information from the cell phone carriers, talking to people who had had contact with Defendant and Ms. Pounds, and trying to obtain information based on the vehicle's GPS. (Tr. 37-38). They had also put out a "BOLO" (be-on-the-lookout) for the car, but that did not yield results. (Tr. 44). One of the locations that was returned was in Jackson County, Georgia. (Tr. 25). Not all of the phone numbers that were associated with Defendant ended up actually belonging to him, including the number associated with his driver's license. (Tr. 25-

---

[9] Manthe does not know what time law enforcement requested the information from AT&T because "there were several people working on the case at that time." (Tr. 41-42).

26). That number "pinged" in Morgan County, Georgia and had different subscriber information. (Tr. 26). The only reason they were able to find Defendant's car was because of the AT&T cell phone ping and the car GPS information. (Tr. 38, 44).

Meanwhile, around 12:30 p.m. on June 10, 2019, Manthe obtained an arrest warrant from a Barrow County Magistrate Judge, but he did not then ask for a search warrant for pinging or GPS information even though they were then working on obtaining that information. (Tr. 43-44, 46). Manthe testified he was not trying to subvert getting a search warrant, but he believed "it was not required to get a search warrant. So I was not going to take the necessary time that it would take if it was not needed" because "time was of the essence[.]" (Tr. 44-45). Manthe explained that "a warrant does take time to type up," approximately 30 minutes, and they were faced with exigent circumstances, i.e., they were looking for Defendant, who they believed had shot one person and "possibly another. Time is of the essence. Bullet wounds, we're talking minutes." (Tr. 46-48). Similarly with respect to his call to Cavender for GPS location for the car, Manthe explained "I am on the hunt for somebody that shot possibly two people. . . . I am going to call and go to the path of least resistance, and that path of least resistance was that phone call," which resulted in learning the location of the car and saving someone's life "as a result of that phone call." (Tr. 49). Thus, Manthe did not believe that he needed to take the time to obtain a search warrant to obtain the geolocation information for the phones and car due to the exigencies they were facing. (Tr. 46-47, 49). He also explained that there are

8

"stopgaps" with the carriers, i.e., they could have denied the requests and told dispatch that they required search warrants, but they did not do so. (Tr. 46-47). When asked whether he could have obtained a search warrant from the same magistrate judge who issued the arrest warrant, Manthe said he could not have done so because in their circuit "requests for cell phone data . . . go[] through superior court, not magistrate court." (Tr. 48).

Based on the officers' belief that Defendant was in Fair Play, South Carolina, Manthe contacted law enforcement in Oconee County, South Carolina. (Tr. 38). Sometime between 1 and 2 p.m. on June 10, 2019, the Oconee County Sheriff's Office received a call informing them about the shooting incident in Georgia and requesting that deputies try to "locate a black male and a white female," i.e., Ralph Jones and Bridget Pounds, "in a vehicle that was believed to be in [their] jurisdiction." (Tr. 54, 67-68). They received information that a cell phone ping indicated Defendant's location was a Dollar General off of Fair Play Boulevard in Fair Play, so Deputy Justin Pelfrey then went to that location, where there were already deputies on scene that had located the subject vehicle and white female. (Tr. 54, 67-69). The vehicle was parked in the Dollar General parking lot, and Ms. Pounds was still in the car. (Tr. 55, 68). She was "speaking incoherently and had blood coming from her mouth" and was vomiting, and the deputies did not know whether she had been shot and had not found an entrance wound. (Tr. 55; Doc. 52-

6 at 3-4). Emergency vehicles were on their way[10], and the deputies were tasked with trying to find the male passenger; they were advised that he had arrest warrants out of Georgia. (Tr. 55, 68). Dispatch also provided a picture of the subject and a description of what he was wearing, i.e., a black striped shirt. (Tr. 56; Doc. 52-6 at 2). Deputies began searching for him and received a "second ping on a cell phone," which gave them a location off of Durham Road, which was "fairly close" to the Dollar General. (Tr. 56, 69, 84-85; Doc. 52-6 at 2). The deputies believed that Defendant still had a gun (referred to as a "59"). (Tr. 60-61; Doc. 52-6 at 2).

Deputy Pelfrey went down Fair Play Boulevard to Durham Road, then Durham Road back toward Dollar General, and he saw someone matching Defendant's description about 200 yards away from the Dollar General behind a flower shop off Fair Play Boulevard. (Tr. 56-57, 69-70; Doc. 52-6 at 4). Pelfrey was wearing a body cam which recorded these events (Tr. 58), and at the hearing the Government entered a CD of the bodycam footage (Ex. 6) and a transcript of that footage (Ex. 7 (Doc. 52-6)). Pelfrey notified dispatch and then made contact with Defendant. (Tr. 57; Doc. 52-6 at 4-5). Pelfrey was in uniform, and he pointed his weapon at Defendant. (Tr. 71). Pelfrey told Defendant to put his hands up and turn around and walk backwards to Pelfrey, and Defendant complied. (Tr. 57, 71-72, 77; Doc. 52-6 at 5). He told Defendant to pull up his shirt and undershirt and asked if

---

[10] Ms. Pounds was eventually taken to the hospital. (Tr. 65).

Defendant had any weapons. (Tr. 72-73; Doc. 52-6 at 5). Defendant responded that he had "nothing on" him and had no weapon. (Tr. 72-73; Doc. 52-6 at 5). Pelfrey told Defendant to go to his knees and then his stomach with his hands out by his side. (Tr. 73-74; Doc. 52-6 at 6). Three or four other deputies had arrived at that point, and they had their guns drawn on Defendant. (Tr. 73-74). Defendant repeated that he had "nothing on him," and Pelfrey handcuffed him and asked him, "You know why you're being detained?" and Defendant responded that it "was a big, big misunderstanding." (Tr. 75; Doc. 52-6 at 6). Pelfrey explained at the hearing that he was "[j]ust trying to make sure that he knows what's going on," that they are trained to tell someone why they are being detained, and Defendant confirmed that he knew why. (Tr. 75, 80). Pelfrey had not advised Defendant of his *Miranda* rights at that point, i.e., the right to remain silent or right to an attorney "or anything like that." (Tr. 76). Pelfrey and the other deputies holstered their weapons after Defendant was handcuffed. (Tr. 83). A K-9 unit was present and searching in nearby bushes, and Defendant asked them not to "bring the dog over here to me, please," and a deputy told him there were not going to do so. (Doc. 52-6 at 6-7). Pelfrey contacted dispatch and advised "You can open up the channel. Show one investigate detention." (Doc. 52-6 at 7). According to Pelfrey, at that point Defendant was not under arrest but was detained until they identified him. (Tr. 62, 75).

Defendant then asked if they could get him off the ground and repeated that he had "nothing on [him]. Nothing's in the car. No weapons, no drugs, no nothing."

11

(Doc. 52-6 at 7). Pelfrey checked Defendants pockets and told him to go to his knees and then stand up, and in response Defendant said, "I haven't done a crime, sir. I haven't done nothing wrong. I was just trying to get her the help." (Tr. 75-77; Doc. 52-6 at 7). Pelfrey asked another deputy a question, and Defendant stated, "I'm from Barrow County, sir. Winder, Georgia." (Doc. 52-6 at 7-8). Pelfrey asked him, "Why are you out here walking?" and Defendant responded, "I ain't from here. She wanted to come out here." (Gov't Ex. 6; Doc. 52-6 at 8). Pelfrey asked, "Why is she bleeding and everything," and Defendant said that she "shot herself . . . And that's why we ran out here." (Doc. 52-6 at 8). Pelfrey asked Defendant where the gun was that the woman shot herself with, and Defendant said that the woman in the car "threw it." (Doc. 52-6 at 8). Pelfrey repeated, "The girl in the car threw it?" and Defendant then said, "I threw it after she shot herself 'cause I didn't want to get in trouble for it." (Doc. 52-6 at 8). Pelfrey asked where he threw the gun, and Defendant responded "[i]n Barrow County." (Doc. 52-6 at 8). Unprompted, Defendant continued, "We was all struggling with the gun, sir. She accidentally shot her friend. We both got scared. I took off running. Here we're in there fighting over the gun. Will you take me to Barrow County?" (Doc. 52-6 at 8). Before placing Defendant in his patrol car, Pelfrey told Defendant, "We're gonna stick around here first. Mind if I search you real quick? Just make sure there's nothing on you," and Defendant responded that he could, "[a]in't nothing on me, officer." (Doc. 52-6 at 9). Pelfrey did not find a

weapon or cell phone. (Tr. 57, 72). He asked Defendant if keys he found were keys to his car and Defendant responded that they were. (Doc. 52-6 at 9).

Dispatch called to advise that the Georgia detainer for Defendant was going to be changed to include surrounding states. (Tr. Tr. 64; Doc. 52-6 at 9). Defendant then stated, "I need to get to Barrow County, sir . . . That's where this thing happened at."  (Doc. 52-6 at 9). Pelfrey responded, "Let me get everything sorted out here and we'll get you where you need to go, all right." (Doc. 52-6 at 9). Defendant asked if Pelfrey could loosen his handcuffs, and Pelfrey told him that he did not know if he could loosen them, but he would make sure they did not get tighter. (Tr. 77-78; Doc. 52-6 at 10). After placing Defendant in his patrol car, Pelfrey called Manthe and told him:

> I found him walking in the woods a short distance from his car where we located it. In the car there was a female with what appears to be a gunshot wound. We've got EMS checking on her now and I just got him in the back of my car. Okay. They did an[] in-state pickup, but you all were in the middle of changing it. Okay. Yeah. I mean I can do a fugitive from justice warrant right now to hold him[.]

(Tr. 57, 78; Doc. 52-6 at 11). After Pelfrey ended his phone call, Defendant told Pelfrey (unprompted), "I was already in the process of trying to find my – me and my girl was gonna turn ourselves in . . . . But due to the situation, what happened, she got scared 'cause we was gonna turn ourselves in and she's like, well, I'm – I'm just gonna go ahead and kill myself." (Doc. 52-6 at 11). Defendant kept talking, and Pelfrey simple responded, "Mm-hm" and "Okay," but he asked no questions while

Defendant talked. (Doc. 52-6 at 11-12). After Defendant finished talking, Pelfrey asked him, "Do you have a problem with me searching the vehicle, make sure the gun and everything --?" and Defendant responded, "I have no problem with you all searching the vehicle. I just want you all to turn me in." (Doc. 52-6 at 13). Pelfrey told Defendant he would "take him back over there," and then made a phone call about an unrelated case. (Doc. 52-6 at 13-15). After that call Pelfrey confirmed with Defendant that he had "no problem with us searching the car, right?" and Defendant responded, "No problem." (Doc. 52-6 at 15).

Pelfrey then took Defendant back to the Dollar General. (Tr. 64, 79). Pelfrey reported to another deputy that he had not found a gun, that Defendant told him that he threw the gun out in Georgia, but that Defendant had consented to search the car, and the deputy told Pelfrey that the woman was going to the hospital. (Doc. 52-6 at 16). Pelfrey also told the deputy that Defendant told him the woman shot herself, and the deputy asked where on her body she had shot herself, so Pelfrey asked Defendant, "Hey, where'd she shoot herself?" and Defendant responded, "In the back of the head." (Doc. 52-6 at 17). Pelfrey then asked Defendant, "This all happened in Georgia?" and Defendant responded, "Yes, it – no, it happened in Winder." (Doc. 52-6 at 17-18). Pelfrey asked, "Where did you throw the gun out at?" and Defendant responded, "In Winder," and then made several more statements about the woman shooting herself, turning himself in, the car breaking down, etc. (Doc. 52-6 at 18). Pelfrey then stated, "Mr. Jones, before I ask you anymore

14

questions or anything, I'm just gonna advise you of your rights, okay." (Doc. 52-6 at 18). Pelfrey read Defendant his rights, i.e., "You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to speak with an attorney and have one present with you while you're questioned if you wish." (Doc. 52-6 at 19). Defendant responded, "Yeah." (*Id*.). Pelfrey continued, "If you cannot afford to hire an attorney, one will be appointed to represent you before any questioning." (*Id*.). Defendant then asked, "Am I being locked up here in Carolina or am I –" and Pelfrey responded, "You're being detained right here in South Carolina, but they do have an active warrant for you in Georgia," in Barrow County. (*Id*.). Defendant and Pelfrey discussed whether they were going to take Defendant back to Barrow County and how that would occur, and another deputy then asked Defendant "where she shot herself?" and Defendant responded, "In the back of the head." (*Id*. at 20). The deputy asked, "Do you know why?" and Defendant responded, "Because she was suicidal. We both was." (*Id*.). Pelfrey asked Defendant, "you understand all those rights I told you?" and Defendant responded, "Yes, sir." (*Id*.). Pelfrey then asked him, "Having those rights in mind, you still wish to talk to me?" and Defendant responded, "No, sir. I'll wait for an attorney." (*Id*.). Pelfrey confirmed that he still gave his consent to search the vehicle, and Defendant said, "Yes. That I don't care about." (*Id*.). Pelfrey asked him if he "need[ed] an attorney present with you for that," and Defendant responded, "No." (*Id*.).

Investigators later obtained search warrants to search the car, Defendant's clothes, and his cell phone. (*See* Doc. 41 at 11-30).

**B.**   **Analysis**

Defendant argues that: (1) he "was subjected to an unreasonable search in violation of the Fourth Amendment when Detective Manthe and Barrow County 911 harvested Defendant's real-time CSLI   [cell-site location information] and GPS [global positioning system] location information without a warrant," and therefore all evidence seized as a result should be suppressed; (2) he "was subjected to a coercive custodial interrogation led by Officer Pelfrey at the time of the arrest" which "resulted in the Defendant making incriminating custodial statements," and therefore such statements should be suppressed; and (3) none of the search warrants issued on June 10, 2019, June 13, 2019, July 17, 2019, and July 22, 2019[11] were "supported by probable cause once unconstitutionally obtained evidence is excised from the supporting affidavits," and therefore any evidence obtained pursuant to those warrants should be suppressed. (Doc. 62 at 2-3).

**1.**   **Defendant's CSLI And GPS Location Data**

Defendant argues that law enforcement violated the Fourth Amendment by "illegally track[ing]" him "by 'pinging' his cellular telephone and collecting GPS

---

[11] As discussed below, the search warrant Defendant references as being issued on July 22, 2019 was actually issued on August 22, 2019. (*See* Doc. 65 at 26 n.8; Doc. 41 at 27-30).

information on his car" without a warrant. (Doc. 62 at 5). The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. "The 'ultimate touchstone of the Fourth Amendment is reasonableness.' " *United States v. Walker*, 799 F.3d 1361, 1363 (11th Cir. 2015) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Where a search is made without a warrant the burden is on the government to "demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the fourth amendment." *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983). Thus, the Court must consider two questions: (1) were the acquisition of cellphone and car location data "searches" within the meaning of the Fourth Amendment, and if so (2) has the Government proven a recognized exception to the warrant requirement?

As to the first question, Defendant concedes that "[i]n the Eleventh Circuit, the law is unsettled as to whether the acquisition of **real-time** CSLI or GPS tracking dat[a] is a 'search' under the Fourth Amendment." (Doc. 62 at 5 (emphasis in original)). In *Carpenter v. United States*, 138 S. Ct. 2206 (2018), the Supreme Court considered the question of "whether the Government conducts a search under the Fourth Amendment when it accesses historical cell phone records that provide a comprehensive chronicle of the user's past movements," and the Court held that such

17

access constitutes a search under the Fourth Amendment generally requiring a search warrant to acquire such records. *Id*. at 2211, 2220-21, 2223. The Court cautioned however, "Our decision today is a narrow one. We do not express a view on matters not before us," including "real-time CSLI" such as that at issue in this case. *Id*. at 2220. As Defendant acknowledges, "[t]o date, the Eleventh Circuit has not addressed the Fourth Amendment implications of the law enforcement obtaining **real-time** CSLI or GPS tracking data." (Doc. 62 at 6 (citing *United States v. Green*, 981 F.3d 945 (11th Cir. 2020) ("The question of acquiring such information constitutes a search was unanswered in 2013 and remains unanswered today.")). Defendant urges the Court to find that the acquisition of real-time CSLI is also a search requiring a warrant because "[h]istorical CSLI is just a series of real-time CSLI and both can reveal very personal information," and "GPS monitoring—by making available at a relatively low cost such a substantial quantum of intimate information about any person whom the government, in its unfettered discretion, chooses to track—may 'alter the relationship between citizen and government in a way that is inimical to democratic society.' " (Doc. 62 at 7-8).

In response, the Government also points out that neither the Supreme Court nor the Eleventh Circuit have decided whether "real-time tracking is a search under the Fourth Amendment."  (Doc. 65 at 9). The Government contends that because the Government did not install the GSP tracker on Defendant's car, the facts of this case "are more akin to the facts in *United States v. Knotts*, 460 U.S. 276 (1983) and *United*

*States v. Karo*, 468 U.S. 705 (1984) in which cases "the tracking device was placed in a container before it came into the defendant's possession and with the consent of the owner of the container, without defendant's knowledge," like the GSP tracking device Cavender Auto Sales, the lienholder, installed on Defendant's car "because they owned, and still own, the car." (Doc. 65 at 10). Thus, the Government asserts, "this Court should find that asking Cavender Auto for the present location of Jones's car on public thoroughfares does not constitute an unreasonable search under the Fourth Amendment." (*Id*. at 11). The Government also argues that the request for real-time geo-location information of the cell phone did not implicate the Fourth Amendment because "[t]he physical location of the phone should not be considered personal information, like a photograph or text message, but more akin to the car tracking situation, especially when third parties are constantly gathering such information, as the phone travels through a public thoroughfare." (*Id*. at 12). The Government points out that the Supreme Court explained in *Carpenter* that that case was "not about 'using a phone' or a person's movement at a particular time. It is about a detailed chronicle of a person's physical presence compiled every day, every moment, over several years." (*Id*. (quoting *Carpenter*, 138 S. Ct. at 2220)). The Government distinguishes the facts in this case from those in *Carpenter* because law enforcement did not obtain such a "detailed chronicle" of Defendant's presence in this case; instead, the officers "requested a one-time, real-time ping of [Defendant's] cell phone." (*Id*. at 13).

19

The Court need not decide whether the acquisition of real-time CSLI and GPS information in this case constituted searches (or seizures) under the Fourth Amendment because even if they were, the Court finds that the Government has proven that the purported searches were reasonable under the exigent circumstances exception to the warrant requirement. The Supreme Court explained in *Carpenter* that "even though the Government will generally need a warrant to access CSLI, case-specific exceptions may support a warrantless search of an individual's cell-site records under certain circumstances," such as when exigent circumstances exist which make a warrantless search objectively reasonable, "including the need to pursue a fleeing suspect, protect individuals who are threatened with imminent harm, or prevent the imminent destruction of evidence." 138 S.Ct. at 2222-23. "As a result, if law enforcement is confronted with an urgent situation, such fact-specific threats will likely justify the warrantless collection of CSLI. Lower courts, for instance, have approved warrantless searches related to bomb threats, active shootings, and child abductions. Our decision does not call into doubt warrantless access to CSLI in such circumstances. While police must get a warrant when collecting CSLI to assist in the mine-run criminal investigation, the rule we set forth does not limit their ability to respond to an ongoing emergency." *Id*. at 2223.

"The most urgent emergency situation excusing police compliance with the warrant requirement is, of course, the need to protect or preserve life." *United States v. Holloway*, 290 F.3d 1331, 1335 (11th Cir. 2002). "In emergencies . . . law

enforcement officers re not motivated by an expectation of seizing evidence of a crime. Rather, the officers are compelled to search by a desire to locate victims and the need to ensure their own safety and that of the public." *Id*. at 1337. "[O]fficers 'do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception.' " *United States v. Evans*, 958 F.3d 1102, 1106 (11th Cir. 2020) (quoting *Michigan v. Fisher*, 558 U.S. 45, 49 (2009) and citing *Holloway*, 290 F.3d at 1340 ("People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process.")). "Instead, [the courts] look to the entirety of the circumstances to see whether a reasonable officer, confronted with those circumstances, could have objectively believed that an immediate search was necessary to safeguard potential victims." *Id*. "The exigency umbrella 'encompasses several common situations where resort to a magistrate for a search warrant is not feasible or advisable, including: danger of flight or escape, loss or destruction of evidence, risk of harm to the public or the police, mobility of a vehicle, and hot pursuit.' " *United States v. Cooks*, 920 F.3d 735, 741-42 (11th Cir. 2019) (quoting *Holloway*, 290 F.3d at 1334). "In order to justify an exigent-circumstances search, the government bears the burden of 'demonstrat[ing] both exigency and probable cause.' " *Id*. (quoting *Holloway*, 290 F.3d at 1337). "[I]n an emergency, the probable cause element may be satisfied where officers reasonably believe a person is in danger." *Holloway*, 290 F.3d at 1338. "Separately, the government must also demonstrate that the resulting search was 'strictly circumscribed by the nature

of the exigency that authorized it' and 'limited to the areas where a person reasonably could be found.' " *Cooks*, 920 F.3d at 742. Having considered the totality of the circumstances, the Court finds that the Government has met its burden of demonstrating that "a reasonable officer, confronted with those circumstances, could have objectively believed that an immediate search was necessary to safeguard potential victims." *Evans*, 958 F.3d at 1106.

Here, the officers had information that Defendant had shot Ms. Jarrell, who was at the scene to try to mediate a custody dispute between Defendant and his girlfriend Ms. Pounds; the officers had incident reports of prior domestic disputes involving Defendant and Ms. Pounds; Defendant and Ms. Pounds had left the scene and the gun used to shoot Ms. Jarrell was not found there, thus raising a concern that Defendant was armed and that Ms. Pounds was in danger; and they did not have information about where Defendant and Ms. Pounds were going. (*See* Tr. 8-12, 15-18, 21-24, 26-28). The officers reasonably believed that Ms. Pounds was in danger, thus satisfying the probable cause element for application of the exigent circumstances exception. The officers immediately began using multiple, simultaneous investigative methods to try to find Defendant and Ms. Pounds, including issuing a BOLO which did not yield any information, requesting cell phone location information from cell phone providers for phone numbers associated with Defendant and Ms. Pounds, and requesting GPS information from the lienholder for Defendant's vehicle, and within 3 hours of responding to the 911

shooting call, the officers had information about Defendant's phone and car being in Fair Play, South Carolina where Defendant and an injured Ms. Pounds were then located. (Tr. 22-24, 26-28, 31-35, 37-41, 44, 51). The officers limited their requests to real-time pings of cell phone numbers associated with Defendant and Ms. Pounds and only requested the current location of Defendant's car from Cavendar Auto, thus demonstrating that their requests were "strictly circumscribed by the nature of the exigency that authorized [them]." *Cooks*, 920 F.3d at 742.

It was not unreasonable for the officers to have sought real-time cell phone location information and GPS information for the car without seeking a search warrant given the exigencies they faced with having a gunshot victim and a potential victim having left with Defendant who appeared to still have the gun with him, the complex and chaotic events of the morning, the efforts by multiple officers to quickly find Defendant and Ms. Pounds after Ms. Jarrell was shot, and the time it would have taken an investigator to prepare search warrant applications for each of the cell phone numbers under consideration and GPS tracking through Cavender before pursuing the geo-location data from the cell phone providers and from Cavender. The undersigned finds the officers' warrantless acquisition of "real-time" geo-location information about Defendant's cell phone and car was objectively reasonable given the exigencies of the circumstances they faced. *See, e.g.*, *United States v. Rosario*, No. 20-2330, 2021 U.S. App. LEXIS 21234, at *11-12 (7th Cir. 2021) (finding that exigent circumstances supported warrantless requests to cell

phone carriers for location information based on the number of handguns stolen during a burglary which "presented a significant threat to public safety"); *United States v. Caraballo*, 831 F.3d 95, 104-05 (2d Cir. 2016) (finding that warrantless pinging of defendant's cell phone was reasonable and based on exigent circumstances where the defendant was suspected of shooting and killing the victim, the defendant had access to guns, and the officers "had good reason to believe that Caraballo was armed" and that "Caraballo would commit acts of violence against undercover agents and confidential informants"); *United States v. Karmo*, No. 20-CR-170, 2021 U.S. Dist. LEXIS 84356, at *18-19 (E.D. Wisc. Feb. 5, 2021) (finding that exigent circumstances supported warrantless collection of cell phone location data where "the FBI received information that Karmo and another man were traveling to Kenosha to loot and pick people off" and "had two long guns concealed in their car"); *United States v. Andrews*, No. 18-CR-149 (SRN/DTS), 2019 U.S. Dist. LEXIS 26283, at *17-20 (D. Minn. Feb. 19, 2019) (finding that warrantless request for cell-site location information was justified by exigent circumstances where the suspect was "linked to two different shootings with multiple victims," and as far as the officer knew, "the suspect was still armed and dangerous").

Defendant argues, however, that "the actual circumstances of the situation did not justify the government's warrantless collection of CSLI/GPS evidence" because Detective Manthe sought an arrest warrant from a magistrate judge at 12:30 that day but did not seek a search warrant at the same time. (Doc. 62 at 10-19). Defendant

argues that "[e]ven if the warrantless collection of location data might have been justified at the outset of Detective Manthe's investigation due to the exigent circumstances exception, the continued collection of location information after he appeared in front of a Magistrate Judge to get an arrest warrant effectively terminates that justification. Once the Detective met with Magistrate, the required showing of 'inevitable delay associated with getting a search warrant' evaporated." (*Id.* at 18). The undersigned disagrees. As Manthe testified, it would have taken additional time to prepare a search warrant application, which he did not believe he needed to do given the exigencies of the situation. (Tr. 43-49). As the morning went on, the officers were not receiving information based on their BOLO and were receiving ongoing information from multiple cell phone carriers which lead to multiple locations and unsuccessful results in their efforts to find Defendant and Ms. Pounds; they only received information about the Fair Play, South Carolina location after Manthe called Cavender Auto at 1:30 p.m. (Tr. 33-36, 39-40, 51). Given the potential danger to Ms. Pounds and need to quickly find her and Defendant as well as the dynamic and changing location information the officers were receiving, the undersigned finds that they reasonably continued trying to find them by requesting the carriers to ping the different phone numbers they were finding and requesting GPS information from Cavender Auto rather than stopping those efforts and waiting until they sought and obtained a warrant (or warrants) for each of those numbers and GPS information.

25

Accordingly, to the extent that Defendant moves to suppress evidence seized as fruits of law enforcement acquiring CSLI and GSP geo-location data on June 10, 2019, it is **RECOMMENDED** that Defendant's motion be **DENIED**.

### 2.   Search Warrants

Following Defendant's arrest on June 10, 2019, officers obtained search warrants to search his car, clothes, and cell phone on June 10, 2019 (Doc. 41 at 11-15 (car)); June 13, 2019 (*id*. at 16-19 (clothes)); June 13, 2019 (*id*. at 20-23 (car)); July 17, 2019 (*id*. at 24-26 (car)); and August 22, 2019 (*id*. at 27-30 (cell phone)). Defendant argues that evidence seized pursuant to those warrants must be suppressed because the search warrants are tainted by evidence illegally seized as a result of the allegedly unlawfully obtained CSLI and GSP location information as discussed above. (Doc. 62 at 30). Defendant contends that once that location information is excised from the search warrant affidavits, the warrants are not supported by probable cause. (*Id*.). Because the undersigned finds that the officers did not unlawfully obtain that location information, the Court need not excise that information from the search warrant affidavits. With that information included, the affidavits sufficiently set forth probable cause to support the issuance of each warrant.

"Where a search is conducted under the authority of a warrant, the defendant challenging the search carries the burden of showing the warrant to be invalid." *United States v. Kilgore*, 2012 U.S. Dist. LEXIS 154148, at *14 (N.D. Ga. Sept. 13,

26

2012) (internal quotation omitted), *adopted by* 2012 U.S. Dist. LEXIS 153867 (N.D. Ga. Oct. 26, 2012). "It is not easy for a Defendant to meet this burden, and a judicial preference is accorded searches under a warrant." *United States v. Teague*, No. 2:10-CR-006-RWS-SSC, 2010 U.S. Dist. LEXIS 142717, at *86 (N.D. Ga. Nov. 22, 2010) (internal quotation omitted), *adopted by* 2011 U.S. Dist. LEXIS 42260 (N.D. Ga. Nov. 22, 2010). "The Fourth Amendment allows warrants to issue on probable cause, a standard well short of absolute certainty." *L.A. County v. Rettele*, 550 U.S. 609, 615 (2007). The task of a magistrate judge, when issuing a warrant, " 'is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The *Miller* court explained the role of a court reviewing a search warrant:

> Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrate[ judges] in their probable cause determinations.

*Miller*, 24 F.3d at 1361 (citing *Gates*, 462 U.S. at 236-37).

Here, the affidavits in support of each of the warrants set forth facts sufficient to show that probable cause to believe that evidence of a crime would be found in the location or object to be searched. The affidavit in support of the June 10, 2019

car search warrant included facts concerning the Oconee County Sheriff's Office receipt of information from Barrow County, Georgia about a vehicle that was involved in a shooting and that a cell phone ping tracked the vehicle to Fair Play, South Carolina; that deputies found the vehicle with Ms. Pounds inside "covered in blood"; that Defendant was identified as the suspect and located near the vehicle; and that the vehicle was towed to a location where the search warrant would be executed. (*See* Doc. 41 at 14). The affidavits in support of the June 10, 2019 clothes search warrant, June 13, 2019 car search warrant, July 17, 2019 car warrant, and the August 22, 2019 cell phone warrant provided information about the Winder Police Department's response to the shooting; the identification of Defendant as the shooter; the discovery of the vehicle in Fair Play, S.C. with Ms. Pounds inside bleeding; and the discovery and apprehension of Defendant in Fair Play. (*Id*. at 17, 21, 25, 28).

Because the affidavits provided probable cause to support the issuance of the above-listed search warrants, it is **RECOMMENDED** that Defendant's motion to suppress evidence seized during the execution of those warrants be **DENIED**.[12]

---

[12] The Government also argues that if the Court "believes references to Jones's location should be excised from the warrants, this Court should still deny Jones's motion to suppress evidence from the car" because he "knowingly and voluntarily consented to the search of the car three times"; because Defendant abandoned the car and therefore did not have an expectation of privacy in it; and because the officers would have inevitably discovered the evidence found in the car because the officers would have searched the car as an inventory search of the impounded vehicle. (Doc. 65 at 27-28). Because the Court finds that the location information is properly in the

### 3.   Defendant's Statements

Defendant argues that "the statements made to Officer Pelfrey should not be admitted because the statements were made while [he] was in custody and being interrogated by Officer Pelfrey prior to being read his *Miranda* rights." (Doc. 62 at 19).

"No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."  U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that the Government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  384 U.S. at 444. Specifically, before a person in custody is interrogated, he must be advised that he has the right to remain silent; that anything he says can and will be used against him in court; that he has the right to consult with a lawyer and to have the lawyer with him during interrogation; and that if he cannot afford a lawyer, a lawyer will be appointed to represent him. *Id*. at 467-73. "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*. at 444. Thus, the Court

---

warrant affidavits and the affidavits otherwise provide probable cause to support issuance of the warrants, it need not reach the Government's alternative arguments.

must consider whether Defendant was in custody when he made the challenged statements and whether he made the statements in response to interrogation.

### a.   <u>Was Defendant In Custody?</u>

It is well-settled that "[p]re-custodial questioning does not require *Miranda* warnings." *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006) (original formatting altered) (citing *United States v. Brown*, 441 F.3d 1330, 1347-49 (11th Cir. 2006)). "A defendant is in custody for the purposes of *Miranda* when there has been a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' " *Street*, 472 F.3d at 1309 (original formatting altered) (quoting *Brown*, 441 F.3d at 1347). In *Street*, the Eleventh Circuit explained that the definition of "custody" for *Miranda* purposes is not the same as the definition of "seizure" for Fourth Amendment purposes:

> [A] seizure does not necessarily constitute custody for *Miranda* purposes. The standards are different. The Fourth Amendment seizure analysis uses the "free to leave" test: a person is "seized" when a reasonable person would not feel free to terminate the encounter with the police. By contrast, a person is in "custody" for *Miranda* purposes only when there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

*Street*, 472 F.3d at 1309-10 (internal citations omitted) (quotation marks omitted); *see also United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010) ("We previously have explained, however, that although a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter

30

at a particular moment -- and thus may be deemed to have been 'seized' by law enforcement -- he will not necessarily be considered in 'custody' for Fifth Amendment purposes." (citing *Street*, 472 F.3d at 1310)). The court in *Street* explained further that the test for whether a person is "in custody" is a "totality of the circumstances determination," and it is objective, as viewed from the perspective of "a reasonable innocent person." 472 F.3d at 1309. Thus, "the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." *Id.* (quoting *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996)).

When applying this test, the court should consider several factors, "including whether 'the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled.' " *Id.* (quoting *United States v. Long*, 866 F.2d 402, 405 (11th Cir. 1989)); *see also United States v. Dix*, No. 3:12-cr-00007-TCB-RGV, 2013 U.S. Dist. LEXIS 22476, at *12 (N.D. Ga. Jan. 29, 2013) ("[F]actors relevant to this determination include, but are not limited to, the location of the interview, the existence of any physical restraints such as handcuffs or drawn weapons, whether the suspect asked to leave, the officers' demeanor, the degree of pressure applied to the suspect, and whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled."), *adopted by* 2013 U.S. Dist. LEXIS 21902 (N.D. Ga. Feb. 19, 2013); *United States v. Johnson*, No.

31

2:12-cr-92-FtM-29DNF, 2013 U.S. Dist. LEXIS 108849, at *58 (M.D. Fla. Feb. 8, 2013) ("Some factors to consider include the location of the questioning, its duration, the types of statements made during the questioning, the presence of physical restraints, and the release of the suspect at the end of the questioning."), *adopted by* 2013 U.S. Dist. LEXIS 108850 (M.D. Fla. Aug. 2, 2013). "No one fact is determinative of the issue of whether the interview was custodial or not." *Id.* at *59. It is the defendant's burden to establish that he was in custody for purposes of *Miranda. See United States v. Asher*, No. 1:09-CR-414-JOB/AJB, 2010 U.S. Dist. LEXIS 112783, at *22-23 (N.D. Ga. Feb. 25, 2010) ("[A] defendant bears the burden of establishing that he was in custody and that his statements were made in response to government questioning."), *adopted by* 2010 U.S. Dist. LEXIS 112823 (N.D. Ga. Oct. 21, 2010).

Defendant asserts that he "was obviously in custody at the time Officer Pelfrey asked him questions" because he was "deprived of his freedom of action in a significant way where "Officer Pelfrey and numerous other South Carolina officers executed a felony arrest of [Defendant] at gunpoint: they forced him to put his hands up and walk backwards towards them, forced him to get on the ground face first, cuffed his hands behind his back, checked Jones for weapons, suggested a dog might be brought out to the scene, and put him in the back of the patrol car." (Doc. 62 at 20-23). The Government did not address the issue of whether Defendant was in custody for purposes of *Miranda*, but instead focused on whether Defendant's

statements were made in response to interrogation, as discussed below. When Deputy Pelfrey stopped and restrained Defendant, he asked Defendant if he knew why he was being "detained" (Tr. 75; Doc. 52-6 at 6), and Pelfrey explained at the hearing that at that point Defendant was not under arrest but was detained until they identified him. (Tr. 62, 75). Pelfrey also contacted dispatch and advised "You can open up the channel. Show one investigate detention" (Doc. 52-6 at 7), thus indicating at that point that Pelfrey was holding Defendant pursuant to an investigative detention, not an arrest. Although the officers had pointed their weapons at Defendant, ordered Plaintiff to lie face down on the ground, handcuffed him, eventually placed him in the back of Pelfrey's patrol car, "an investigatory stop does not necessarily ripen into an arrest because an officer draws his weapon,[] handcuffs a suspect,[] orders a suspect to lie face down on the ground,[] or secures a suspect in the back of a patrol car[]." *United States v. Acosta*, 363 F.3d 1141, 1147 (11th Cir. 2004) (citations omitted); *see also United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995) (stating that "the fact that police handcuff the person or draw their weapons does not, as a matter of course, transform an investigatory detention into an arrest"). Those actions were reasonable in this case given that Defendant was suspected of shooting a person in Georgia, and a woman was found in his vehicle in Fair Play, bleeding from her mouth and incoherent. "The Supreme Court has stated that officers may take reasonable steps to ensure their safety so long as the possess 'an articulable and objectively reasonable belief that the suspect is

potentially dangerous.' " *Acosta*, 363 F.3d at 1146-47 (quoting *Michigan v. Long*, 463 U.S. 1032, 1051 (1983)). Thus, the undersigned is not convinced that Defendant has met his burden of establishing that he was in custody for purposes of *Miranda* when Pelfrey placed him in handcuffs and asked him "You know why you're being detained?" Nevertheless, assuming for the sake of discussion that Defendant was then in custody, the undersigned finds that Defendant's statements are not subject to suppression for the reasons discussed below.

### b.   Was Defendant Interrogated For Purposes Of *Miranda*

"An 'interrogation' for *Miranda* purposes is defined as 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.' " *United States v. Williams*, 784 Fed. Appx. 707, 708 (11th Cir. 2019) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). "[T]he Miranda rule 'does not reach a situation . . . where the statements were unsolicited, spontaneous and freely made prior to any attempted interrogation.' " *Sullivan v. Alabama*, 666 F.2d 478, 482 (11th Cir. 1982) (quoting *United States v. Savell*, 546 F.2d 43, 46 (5th Cir. 1997)[13]).

### (1)   Pre-*Miranda* Statements

---

[13] Decisions of the Fifth Circuit handed down before Oct. 1, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc).

As set forth in the facts section and reflected in the bodycam video (Gov't Ex. 6) and the transcript of Pelfrey's encounter with Defendant (Gov't Ex. 7 (Doc. 52-6)), Defendant made numerous statements following his apprehension, most of which were not made in response to any questioning by Pelfrey, but instead were unsolicited and spontaneous. Others statements were made in response to questioning that did not constitute interrogation or was subject to an exception to the *Miranda* rule. Specifically, as Pelfrey handcuffed Defendant, he asked him, "You know why you're being detained?" and Defendant responded that it "was a big, big misunderstanding." (Tr. 75; Doc. 52-6 at 6). That was Defendant's only response to Pelfrey's question, which satisfied Pelfrey's intent to make sure that Defendant knew why he was being detained. Pelfrey explained at the hearing that he was "[j]ust trying to make sure that he knows what's going on," that they are trained to tell someone why they are being detained, and Defendant told him why he was being detained, "it was what I knew at the time." (Tr. 75, 80). The undersigned finds that Pelfrey's question did not constitute interrogation as it was akin to the types of questions "normally attendant to arrest and custody." *Innis*, 446 U.S. at 301. Pelfrey did not follow up or ask any additional questions of Defendant at that time. Instead, Defendant asked them not to bring the K-9 unit over to him, Pelfrey notified dispatch that he had "one investigate detention," Defendant asked if the deputies could get him off the ground, and Defendant volunteered that he had "nothing on [him]. Nothing's in the car. No weapons, no drugs, no nothing." (Doc. 52-6 at 7).

Pelfrey then told Defendant to stand up, to which Defendant said, "I haven't done a crime, sir. I haven't done nothing wrong. I was just trying to get her the help." (Tr. 75-77; Doc. 52-6 at 7). That unsolicited statement was not made in response to questioning; Pelfrey had simply instructed Defendant to stand up. Several minutes had elapsed and other conversation and actions had occurred since Pelfrey had initially asked Defendant if he knew why he was being detained. Thus, the undersigned finds that that statement was not made in response to interrogation. Defendant also stated without prompting, "I'm from Barrow County, sir. Winder, Georgia." (Doc. 52-6 at 7-8). Pelfrey then responded to that statement by asking, "Why are you out here walking?" and Defendant responded, "I ain't from here. She wanted to come out here." (Gov't Ex. 6; Doc. 52-6 at 8). At that point, Pelfrey had not asked Defendant about the woman in Defendant's vehicle, but because Defendant spontaneously brought her up, Pelfrey asked, "Why is she bleeding and everything," and Defendant said that she "shot herself . . . And that's why we ran out here." (Doc. 52-6 at 8). Pelfrey then asked Defendant where the gun was that the woman shot herself with, and Defendant said that the woman in the car "threw it." (Doc. 52-6 at 8). Pelfrey repeated, "The girl in the car threw it?" and Defendant responded, "I threw it after she shot herself 'cause I didn't want to get in trouble for it." (Doc. 52-6 at 8). Pelfrey asked where he threw the gun, and Defendant responded "[i]n Barrow County." (Doc. 52-6 at 8). Pelfrey did not then ask another question about the gun beyond asking where Defendant threw it, but Defendant continued

36

talking about it: "We was all struggling with the gun, sir. She accidentally shot her friend. We both got scared. I took off running. Here we're in there fighting over the gun. Will you take me to Barrow County?" (Doc. 52-6 at 8). The undersigned finds that Defendant initiated this conversation with Pelfrey by volunteering that he was from Barrow County, Georgia, which naturally prompted Pelfrey to inquire as to why he was walking in Fair Play, South Carolina. Once Defendant began spontaneously discussing Ms. Pounds, Pelfrey simply continued the conversation by asking follow-up or clarifying questions to Defendant's unsolicited statements, which did not constitute interrogation for purposes of *Miranda*. *See, e.g.*, *United States v. Villegos-Tello*, 319 Fed. Appx. 871, 875-76 (11th Cir. 2009) (finding that law enforcement questions seeking to clarify defendant's unsolicited statements did not constitute interrogation requiring *Miranda* warnings where the defendant said "the green's not mine" and the officer asked if he meant marijuana and to whom the marijuana belonged); *United States v. Jules*, 244 Fed. Appx. 964, 972-73 (11th Cir. 2007) (district court's finding not clearly erroneous "that the agent's query as to what Jules was laughing about was a normal natural inquiry that did not rise to the level of interrogation, and therefore, Jules's response, which the court equated to a spontaneous statement, was admissible"); *United States v. Gonzalez*, 121 F.3d 928, 939-40 (5th Cir. 1997) (finding no *Miranda* violation where the defendant "voluntarily initiated the colloquy" by boasting about his crimes, thus "eliciting a response from [the officer]" and explaining that the officer's "request for

clarification was not a 'custodial interrogation' for purposes of the *Miranda* doctrine"); *United States v. Rhodes*, 779 F.2d 1019, 1032 (4th Cir. 1985) (finding that officer's question "why" in response to the defendant's statement that he could not take defendant's notebook was not interrogation where defendant had initiated the conversation and that defendant's response to the question was spontaneous and not the product of interrogation); *Anderson v. Thieret*, 903 F.2d 526, 532 (7th Cir. 1990) (finding that the defendant voluntarily stated, "I stabbed her" and that "the police officer's responsive question, 'Who?,' did not require full *Miranda* warning before its utterance" because it "was a neutral response, intended to clarify Anderson's puzzling declaration; it was not coercive interrogation that *Mirands* seeks to prevent").

Moreover, as the Government points out, "questions related to public safety are exempted from the *Miranda* requirements." (Doc. 65 at 24). In *New York v. Quarles*, 467 U.S. 649 (1984), the Supreme Court held that an officer was not required to give the defendant *Miranda* warnings before asking about the location of a gun because "overriding considerations of public safety justify the officer's failure to provide *Miranda* warnings before he asked questions devoted to locating the abandoned weapon." *Id.* at 651; *see also United States v. Williams*, 784 Fed. Appx. 707, 710 (11th Cir. 2019) (explaining that the officers "questions as to the location of the firearm were proper to protect himself, his fellow officer, and the other individuals on the scene, and thus feel within the public safety exception" to

*Miranda*). Here, the officers had received information that Defendant had shot someone in Georgia, they discovered a woman bleeding from her mouth in Defendant's car thus indicating the possibility that she had been shot, and Deputy Pelfrey had not found a gun on Defendant's person, thus raising reasonable concerns about public safety due to the missing gun.

Defendant's statements about struggling with Ms. Pounds over the gun, Ms. Pounds shooting Ms. Jarrell, and taking "off running" were unprompted by Pelfrey's question, which simply asked where Defendant threw the gun. (*See* Doc. 52-6 at 8). Thus, those statements were not the product of interrogation. Later, after Pelfrey searched Defendant, placed him in the patrol car, and spoke with dispatch about the detainer, Defendant stated, "I need to get to Barrow County, sir . . . That's where this thing happened at," again without Pelfrey asking him any questions. (Doc. 52-6 at 9). Pelfrey did not then respond to Defendant's statement or question him about it. (*Id*.). It was after Pelfrey called Detective Manthe that Defendant told Pelfrey—without being asked—"I was already in the process of trying to find my – me and my girl was gonna turn ourselves in . . . . But due to the situation, what happened, she got scared 'cause we was gonna turn ourselves in and she's like, well, I'm – I'm just gonna go ahead and kill myself." (Doc. 52-6 at 11). Defendant kept talking, and Pelfrey simple responded, "Mm-hm" and "Okay," but he asked no questions while Defendant talked. (Doc. 52-6 at 11-12). The undersigned finds that these volunteered

statements, made spontaneously and without prompting or questioning by Pelfrey, were not the product of interrogation for purposes of *Miranda*.

When back at Dollar General with Defendant, Pelfrey and another deputy discussed the injured woman, Ms. Pounds, who was being taken to the hospital, and Pelfrey asked Defendant where on her body she had shot herself, and Defendant responded, "In the back of the head." (Doc. 52-6 at 16-17). Pelfrey then asked Defendant, "This all happened in Georgia?" and Defendant responded, "Yes, it – no, it happened in Winder." (Doc. 52-6 at 17-18). Pelfrey again asked, "Where did you throw the gun out at?" and Defendant responded, "In Winder," and then made several more statements about the woman shooting herself, turning himself in, the car breaking down, etc. (Doc. 52-6 at 18). At that point Pelfrey advised Defendant of his *Miranda* rights. (Doc. 52-6 at 18-19). The undersigned finds that Pelfrey's questioning of Defendant at Dollar General about the location of the gun did not run afoul of *Miranda* under the public safety exemption as discussed above. Pelfrey's question about where Ms. Pounds shot herself is a closer question, however, as the Government concedes. (Doc. 65 at 25). The undersigned agrees with the Government that Pelfrey's question about where Ms. Pounds shot herself "should fall under the public safety exemption." (*Id*.). The record shows that Pelfrey asked Defendant this question as Ms. Pounds was receiving treatment because she was bleeding profusely from her mouth and vomiting, yet she was speaking incoherently and therefore unable to describe what happened or how she was injured, and the

deputies initially did not know whether she had been shot and had not found an entrance wound. (Tr. 55; Doc. 52-6 at 3-4). Thus, the exigencies of the situation and need to obtain information for her safety and protection justified questioning Defendant about her injury even though *Miranda* warnings had not been given. Moreover, as discussed below, Defendant repeated that Ms. Pounds had shot herself in the head after he was advised of his *Miranda* rights, thus his statement that she shot herself in the head need not be suppressed.

Accordingly, the undersigned finds that Defendant's pre-*Miranda* statements were not the product of unlawful custodial interrogation and therefore need not be suppressed.

### (2)   Post-*Miranda* Statements

"Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights' when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010); *see also United States v. Bernal-Benitez*, 594 F.3d 1303, 1318 (11th Cir. 2010 (explaining that a defendant may waive his *Miranda* rights, "but only if 'the waiver is made voluntarily, knowingly and intelligently.' " (quoting *Miranda*, 384 U.S. at 444)). "The waiver inquiry 'has two distinct dimensions': waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both

the nature of the right being abandoned and the consequences of the decision to abandon it.' " *Thompkins*, 560 U.S. at 382-83 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). The Government bears the burden of proving both "dimensions" by a preponderance of the evidence. *United States v. Bushay*, 859 F. Supp. 2d 1335, 1372 (N.D. Ga. 2012) (citing *Thompkins*, 560 U.S. at 384); *see also Bernal-Benitez*, 594 F.3d at 1318 ("The Government must prove by a preponderance of the evidence that the defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights."). "Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran*, 475 U.S. at 421 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)); *see also Bushay*, 859 F. Supp. 2d at 1373 ("A waiver is effective where the totality of the circumstances reveal both an uncoerced choice and the requisite level of comprehension."). "The prosecution . . . does not need to show that a waiver of *Miranda* rights was express," however. *Thompkins*, 560 U.S. at 384. "An 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence."

Here, Pelfrey advised Defendant of his *Miranda* rights after Defendant made the statements discussed above when they returned to Dollar General. Pelfrey told him, "Mr. Jones, before I ask you anymore questions or anything, I'm just gonna advise you of your rights, okay." (Doc. 52-6 at 18). Pelfrey then read Defendant his

rights, i.e., "You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to speak with an attorney and have one present with you while you're questioned if you wish." (Doc. 52-6 at 19). Defendant responded, "Yeah." (*Id.*). Pelfrey continued, "If you cannot afford to hire an attorney, one will be appointed to represent you before any questioning." (*Id.*). Defendant did not ask Pelfrey about those rights, but asked Pelfrey, "Am I being locked up here in Carolina or am I –" and Pelfrey responded, "You're being detained right here in South Carolina, but they do have an active warrant for you in Georgia," in Barrow County. (Doc. 52-6 at 19). Defendant and Pelfrey then discussed whether they were going to take Defendant back to Barrow County and how that would occur. (*Id.* at 20). Another deputy then asked Defendant "where she shot herself?" and Defendant responded, "In the back of the head." (*Id.* at 20). The deputy asked, "Do you know why?" and Defendant responded, "Because she was suicidal. We both was." (*Id.*). Pelfrey asked Defendant, "you understand all those rights I told you?" and Defendant responded, "Yes, sir." (*Id.*). Pelfrey then asked him, "Having those rights in mind, you still wish to talk to me?" and Defendant responded, "No, sir. I'll wait for an attorney." (*Id.*). Pelfrey confirmed that he still gave his consent to search the vehicle, and Defendant said, "Yes. That I don't care about." (*Id.*). Pelfrey asked him if he "need[ed] an attorney present with you for that," and Defendant responded, "No." (*Id.*).

The undersigned finds that the Government has met its burden of proving that Defendant knowingly and voluntarily waived his *Miranda* rights. Pelfrey advised Defendant of his rights; he said "Yeah" as Pelfrey read them thus indicating his acknowledgement of them; he asked no clarifying questions about them; and he at least implicitly waived those rights when he voluntarily responded to the other deputy's questions without an attorney present. Moreover, he told Pelfrey that he understood the rights Pelfrey had read him, and he then chose not to continue answering questions until an attorney was present, thus indicating that he understood that he had the right not to answer questions and to have an attorney present and that he did not feel so coerced by the deputies' actions that he simply acquiesced to their show of authority. The undersigned therefore finds that Defendant voluntarily and knowingly waived his rights under *Miranda* and that any statements Defendant made after Pelfrey advised him of his *Miranda* rights were made voluntarily.

It is therefore **RECOMMENDED** that Defendant's motion to suppress his June 10, 2019 statements to law enforcement be **DENIED**.

## Summary

For the reasons discussed above, it is **RECOMMENDED** that Defendant's Motion To Dismiss Count Two Of The Indictment (Doc. 28) be **GRANTED** and his Motion To Suppress (Doc. 41) be **DENIED**.

**IT IS FURTHER ORDERED** that, subject to a ruling by the District Judge on any objections to orders or recommendations of the undersigned Magistrate

Judge, this case is **CERTIFIED READY FOR TRIAL**.

      **IT IS SO REPORTED AND RECOMMENDED** this 7th day of October, 2021.

                            /s/ J. Clay Fuller
                            J. Clay Fuller
                            United States Magistrate Judge