## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

RALPH HAYWOOD JONES, JR.,

Defendant.

Criminal Action No.

2:19-cr-44-RWS-JCF

## ORDER

This matter is before the Court on the October 7, 2021 Report and
Recommendation [Dkt. 67] of Magistrate Judge J. Clay Fuller and Defendant's
Motion to Dismiss Count Two of the Indictment [Dkt. 28] and Motion to Suppress
[Dkt. 41].  Judge Fuller recommends that Defendant's Motion to Dismiss Count
Two [Dkt 28] be granted and that his Motion to Suppress [Dkt. 41] be denied.
Defendant objects [Dkt. 72] to Judge Fuller's recommendation that his Motion to
Suppress be denied.

## LEGAL STANDARD

In reviewing a Report and Recommendation ("R&R"), the district court
"shall make a *de novo* determination of those portions of the report or specified

proposed findings or recommendations to which objection is made." 28 U.S.C. §

636(b)(1). "Parties filing objections to a magistrate's report and recommendation

must specifically identify those findings objected to. Frivolous, conclusive, or

general objections need not be considered by the district court." United States v.

Schultz, 565 F.3d 1353, 1361 (11th Cir. 2009) (quoting Marsden v. Moore, 847

F.2d 1536, 1548 (11th Cir. 1988)) (internal quotation marks omitted). Absent

objection, the district judge "may accept, reject, or modify, in whole or in part, the

findings and recommendations made by the magistrate [judge]," 28 U.S.C. §

636(b)(1), and "need only satisfy itself that there is no clear error on the face of the

record" in order to accept the recommendation. Fed. R. Civ. P. 72, advisory

committee note, 1983 Edition, Subdivision (b). In accordance with 28 U.S.C. §

636(b)(1) and Rule 72 of the Federal Rules of Civil Procedure, the Court has

conducted a *de novo* review of those portions of the R&R to which Plaintiff objects

and has reviewed the remainder of the R&R for plain error. See United States v.

Slay, 714 F.2d 1093, 1095 (11th Cir. 1983).

## OBJECTIONS

Defendant objects to Judge Fuller's analysis of the Defendant's Motion to

Suppress and contends that the R&R should be modified and find that law

enforcement violated both the Fourth and Fifth Amendments to the Constitution.

More specifically, Defendant contends that he was subjected to an unreasonable search and seizure in violation of the Fourth Amendment when Detective Manthe accessed his CSLI and GPS location information without a warrant.  In addition, Defendant objects to law enforcement's post-arrest conduct and argues that Officer Pelfrey conducted a custodial interrogation without first providing Defendant a <u>Miranda</u> warning.[1]

Defendant does not object or dispute the Magistrate Judge's recitation of the relevant facts in the R&R.

Having reviewed the record, the Court enters the following Order.

## DISCUSSION

As an initial matter, the Court notes that the legal arguments raised by Defendant in his objections to the R&R are essentially the same arguments advanced in support of the Motion to Suppress before Judge Fuller. The undersigned questions whether either objection qualifies as "specific" enough to warrant a *de novo* review.  Both issues have been thoroughly analyzed by the Magistrate Judge.

---

[1] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

3

## I.  Alleged Unlawful "Location" Search

Defendant relies upon <u>Carpenter v. United States</u>, 138 S. Ct. 2206 (2018), in support of the argument that law enforcement's gathering of his GPS and CSLI location information was a search under the Fourth Amendment.  He suggests that the Court should extend the holding in <u>Carpenter</u> to find that GPS location information constitutes a search because it presents similar privacy concerns.  The gist of Defendant's argument is that governing Eleventh Circuit precedent (<u>Karo &amp; Knotts</u>)[2] are a "bad fit" for new cell phones and GPS location technology.

As noted by Judge Fuller, the parties concede that the Fourth Amendment implications of real-time CSLI or GPS tracking has yet to be squarely addressed by either the Supreme Court or the Eleventh Circuit.  [R&R at 17-18].  Therefore, even if persuaded by the defense argument, this Court is obliged to follow existing circuit precedent.  Moreover, even if the real-time tracking could be deemed a Fourth Amendment search, the Court also agrees that the Government met its burden to demonstrate exigent circumstances based upon the testimony of Detective Manthe and, in particular, his testimony that he had reason to believe that the life of the suspect's kidnapping victim (Bridget Pounds) was in danger.

---

[2] <u>See</u> <u>United States v. Knotts</u>, 460 U.S. 276 (1983), and <u>United States v. Karo</u>, 468 U.S. 705 (1984).

[Dkt. 58 - 4/16/21 Mot. Hr'g Tr. ("Hr'g Tr.") 24; Govt. Exh. 3 – T-Mobile Exigent Request Form].

As for the evidence that was eventually seized from the car, in part, due to law enforcement's ability to locate Defendant, the Government correctly states that the search warrants obtained later were supported by probable cause, and the evidence from the Defendant's car was subject to multiple exceptions to the warrant requirement in any event.

This objection is overruled.

## II.    Alleged Unlawful Custodial Interrogation – Defendant's Statements

The second objection involves the admissibility of statements made by Defendant in the presence of law enforcement on the date of arrest.  Certain of these statements were made before Defendant was read his Miranda rights. Defendant contends that the questions posed by law enforcement were designed to elicit incriminating statements in violation of the Fifth Amendment.

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ."  U.S. CONST. AMEND. V.  In Miranda v. Arizona, the Supreme Court held that protecting a suspect's Fifth Amendment privilege against self-incrimination requires that an accused be warned prior to "custodial interrogation" that "he has a right to remain silent, that

5

any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 86 S. Ct. at 1612 (footnote omitted).  Simply stated, "if the police take a suspect into custody and then ask him questions without informing him of the rights enumerated [in Miranda]. . ., his responses cannot be introduced into evidence to establish his guilt." Berkemer v. McCarty, 104 S. Ct. 3138, 3144 (1984) (citations omitted).

In the R&R, consistent with the Government's approach [R&R at 32-33], Judge Fuller presumed for purposes of analysis that Defendant was "in custody" for the duration of his encounter with law enforcement [R&R at 34] and found that, regardless of Miranda, the statements made by Defendant were either spontaneous and volunteered (as opposed to being the result of interrogation) or subject to one or more exceptions (i.e., routine booking exception, public safety exception, exigent circumstances exception).  Because "custody" is assumed, the Court's analysis begins with determining whether Defendant Jones was subject to "interrogation" prior to the Miranda warning.

Under Miranda, interrogation may include express questioning or its functional equivalent -- "any words or actions on the part of police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."  Rhode Island v. Innis, 100 S. Ct. 1682, 1689-90 (1980) (emphasizing

6

that focus should be "primarily upon the perceptions of the suspect, rather than the intent of the police").  Additionally, interrogation contemplates "a measure of compulsion above and beyond that inherent in custody itself."  Innis, 100 S. Ct. at 1689.

An "'incriminating response' includes 'any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial.'" United States v. Lopez-Garcia, 565 F.3d 1306, 1316-17 (11th Cir. 2009) (quoting Innis, 100 S. Ct. at 1690 n.5 (emphasis in original)).

The burden is Defendant's to establish that his statements were made in response to government interrogation.  See United States v. Guerrero–Barajas, 240 F.3d 428, 432 (5th Cir. 2001) (citation omitted).

With respect to Defendant Jones' statements, the critical question is whether the law enforcement officer involved (here, Deputy Pelfrey) *should have known* that his questions or actions were "reasonably likely to elicit an incriminating response" from Defendant.  Innis, 100 S. Ct. at 1689-90.

## A. Pre-Miranda Statements

As an initial matter, Miranda safeguards do not render a defendant's unsolicited or spontaneous statements to law enforcement inadmissible.  See Miranda, 86 S. Ct. at 1629 ("Volunteered statements of any kind are not barred by

7

the Fifth Amendment. . . ."); accord United States v. Savell, 546 F.2d 43, 45-46 (5th Cir. 1977) ("Miranda only requires that a recital of the warnings precede interrogation and does not reach a situation . . . where the statements were unsolicited, spontaneous and freely made prior to any attempted interrogation").[3]

Concerning his pre-Miranda interaction with Defendant Jones, Deputy Pelfrey testified that, "I asked him a few [questions] and he just talked a lot." [Hr'g Tr. 75].  There are several obvious examples of Defendant Jones' voluntary, spontaneous, and non-responsive statements made in Deputy Pelfrey's presence, which the Court need not address.  The Court turns to Defendant's statements that were responsive to express questions posed by law enforcement.

## 1.  Initial Encounter

First, Defendant challenges the propriety of Deputy Pelfrey's initial question to Defendant, "You know why you're being detained?"  Counsel argues that asking Defendant if he knows why he is being detained is an interrogation tactic and/or an invitation for Defendant to admit some wrongdoing.[4]  [Hr'g Tr. 79-80].

---

[3] Decisions of the Fifth Circuit that precede October 1, 1981 have been adopted as binding precedent in the Eleventh Circuit.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[4] Related to this argument, Defendant suggests that spontaneous statements made mid-interrogation are *not* exempt from Miranda safeguards.  In other words, *if* the Court agrees with the defense that the interrogation began with Deputy Pelfrey's

Judge Fuller found that Defendant's initial statements to law enforcement –

including his explanation for why he believed he was being detained – were either

not responsive to interrogation and/or fell within the routine booking exception.

[R&R at 35 ("The undersigned finds that Pelfrey's question did not constitute

interrogation as it was akin to the types of questions 'normally attendant to arrest

and custody.'") (citing <u>Innis</u>, 100 S. Ct. at 1689)].  In <u>Innis</u>, the Supreme Court

carved out an exception to <u>Miranda</u> for questions "normally attendant to arrest and

custody."  <u>Innis</u>, 100 S. Ct. at 1689-90.  As a rule, law enforcement questions

pursuant to routine booking procedures do not constitute "interrogation" within the

meaning of <u>Miranda</u> where they are not intended to elicit information for

investigatory purposes.  <u>See</u> <u>Pennsylvania v. Muniz</u>, 110 S. Ct. 2638, 2650 (1990).

The booking exception includes basic information that law enforcement might

request (for administrative purposes) such as a suspect's age, height, weight, eye

color, name, and current address.  <u>Id.</u>

In his objections, Defendant contends that the routine booking exception is

to be construed more narrowly.  <u>See, e.g.</u>, <u>United States v. Corey</u>, 861 F.Supp.2d

---

question "You know why you're being detained?" application of the clarifying
questions and spontaneous statements exceptions to <u>Miranda</u> is precluded.  [Dkt.
72 at 15-17].

1341, 1344 (S.D. Fla. 2012).[5]  However, as explained herein, Judge Fuller did not

solely rely on the booking exception.  The R&R finds that there was no

interrogation, and, therefore, no <u>Miranda</u> warning was required.

To that point, Deputy Pelfrey testified that he was trained to advise suspects

why they are being detained and stated that Defendant Jones was aware since

Defendant was the first to mention the outstanding arrest warrant issued in

Georgia.  [Hr'g Tr. 75-76].  Defendant's response to Deputy Pelfrey's question

was, "Yes sir.  It is a big, big misunderstanding."  [Dkt. 52-7 / Gvmt. Exh. 7

(Deputy Pelfrey's BodyCam Audio Tr.) at 6; Hr'g Tr. 75].  Deputy Pelfrey did not

ask any follow up questions at that time.

The Court tends to agree with defense counsel that the question was

inappropriate as originally phrased and put to Defendant Jones.  Arguably, the

better practice would have been either 1) for Deputy Pelfrey to simply advise

Defendant of the reason he was being detained without asking the question; or 2)

provide <u>Miranda</u> warnings before asking the question.  Even so, the Court agrees

that Deputy Pelfrey's question, albeit not biographical, was more akin to a

---

[5] The Court finds <u>United States v. Corey</u>, 861 F.Supp.2d 1341 (S.D. Fla. 2012),
cited by Defendant, instructive.  <u>Corey</u> illustrates the importance of context when
evaluating whether an interrogation has occurred, whether statements made to law
enforcement are responsive to interrogation, and the contours of determining the
admissibility of statements.  <u>Id.</u> at 1344-46 (citations omitted).

statement made by law enforcement in conjunction with effecting an arrest or placing someone in custody than an interrogatory of criminal activity.  More importantly, the transcript of the exchange between Deputy Pelfrey and Defendant does not reveal a coercive encounter or environment.  The aim of Miranda and its procedural safeguards was to address "the coercive pressures that can be brought to bear upon a suspect in the context of custodial interrogation." Berkemer v. McCarty, 104 S. Ct. 3138, 3144 (1984) (citation omitted).  As such, the Court cannot conclude that Deputy Pelfrey should have known that the question was "reasonably likely to elicit an incriminating response" from Defendant.  Innis, 100 S. Ct. at 1689-90.  The Court agrees that the question did not amount to interrogation for purposes of Miranda.

### 2.  Follow-Up & Clarifying Questions

Defendant also takes issue with Deputy Pelfrey's question as to why Defendant was found on foot in Fair Play, South Carolina.  To place the question in context, as noted in the R&R ("without prompting"), Defendant explained to Deputy Pelfrey, "I'm from Barrow County, sir.  Winder, Georgia."  [R&R at 36; Gvmt. Exh. 7 at 8].  In response to Defendant's statement that he was from Georgia, Deputy Pelfrey then asked, "Why are you out here walking?"  [Id.].  Defendant responded that, "I ain't from here.  She wanted to come out here."  [Id.].

Given that Defendant initiated conversation with Deputy Pelfrey and volunteered that he was not from South Carolina, Judge Fuller found that Deputy Pelfrey's inquiry did not rise to the level of interrogation.  [R&R at 37 (follow up inquiry by Deputy Pelfrey "naturally prompted")].  Judge Fuller explained that law enforcement is permitted to clarify a defendant's unsolicited statements and that follow-up questions of this nature do not constitute interrogation requiring a Miranda warning.  [R&R at 37-38].  Again, the better practice may have been to refrain from asking the question until the Miranda warning was given.[6]  On this record, the Court agrees that no interrogation occurred.

---

[6] In Corey, the district court stated that asking the question "what are you doing in the area" is investigatory (not biographical) and would have been permissible prior to arrest.  Corey, 861 F.Supp.2d at 1344.  Under the facts of the case, including, that law enforcement already knew about a firearm (defendant seen hiding a firearm in a firepot before being detained), the district judge found that law enforcement's question "can be reasonably expected to elicit an incriminating response."  Id.  Defendant Corey's answer, whereby he admitted that he had a firearm on him (and which provided evidence to convict him for possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1)), was suppressed.  Id. at 1345-46.  The court acknowledged how close of a call it was and stated that the suppression issue would be a much easier decision if the officer's question had specifically mentioned the firearm.  Id. at 1346.  A distinguishing fact in this case is that Defendant Jones was the one engaging Deputy Pelfrey in conversation.

### 3.  Public Safety Exception

The next group of questions Defendant seeks to suppress followed
Defendant's initial reference to Ms. Pounds, the injured female passenger found in
Defendant's vehicle.  Deputy Pelfrey asked, "Why is she bleeding and everything,"
to which Defendant advised that she "shot herself . . . and that's why we ran out
here."  [Gvmt. Exh. 7 at 8].  Deputy Pelfrey also asked where the gun was that the
woman shot herself with and Defendant stated that the woman in the car "threw it."
[Id.].  Deputy Pelfrey then repeated, "The girl in the car threw it?"  [Id.].
Defendant stated, "I threw it after she shot herself 'cause I didn't want to get in
trouble for it."  [Id.].  Deputy Pelfrey then asked where Defendant threw the gun
and Defendant told him "[i]n Barrow County."  [Id.].

Deputy Pelfrey did not ask any more questions about the location of the gun
and turned to other tasks. However, Defendant continued to make non-responsive
statements about the precipitating events in Georgia, struggling over the gun, Ms.
Pounds allegedly shooting her friend accidentally, and he and Ms. Pounds deciding
to flee.  [Id.].

Judge Fuller determined that, once Defendant began volunteering
information about Ms. Pounds, the additional questions posed by Deputy Pelfrey
were permissible to clarify what Defendant said.  [R&R at 37].  Judge Fuller

13

explained that Deputy Pelfrey had not asked Defendant about the woman in Defendant's vehicle at that point, "but because Defendant spontaneously brought her up," Deputy Pelfrey's additional questions were okay.  [R&R at 36].

If asked solely for the purpose of clarifying Defendant Jones' voluntary statements, Deputy Pelfrey's questions do not violate Miranda.  See, e.g., United States v. Villegas-Tello, 319 Fed. Appx. 871, 876 (11th Cir. 2009).  The Court finds this exchange a closer call but affirms Judge Fuller's findings and legal conclusion nonetheless.

Alternatively, if Deputy Pelfrey's questions could be construed as an interrogation under Miranda, and interrogation did, in fact, occur, the undersigned would find that many, if not all, of the questions fall within the public safety exception.  See New York v. Quarles, 104 S. Ct. 2626, 2629-2632 (1984) (recognizing "public safety" exception to requirement that Miranda warning be given for officers' "questions reasonably prompted by a concern for the public safety"); see also United States v. Williams, 784 Fed. Appx. 707, 710 (11th Cir. 2019).  The same is true for the final round of questions concerning Ms. Pound and the firearm.

The latter group of pre-Miranda questions took place once Deputy Pelfrey and Defendant returned to Dollar General, which was also where Defendant's

vehicle was parked. Amidst more voluntary and non-responsive statements made by Defendant, Deputy Pelfrey went about his business communicating with other law enforcement officers over the radio and in person, as necessary. Defendant mentioned wanting to return to Barrow County, and he asked that his handcuffs be adjusted. By this time, Ms. Pounds was either on her way to the hospital or a decision had been made by first responders that she would be going to the hospital for treatment. The officers on the scene, including Deputy Pelfrey, were discussing Ms. Pounds as well as whether Defendant's car had been searched for the missing gun and the whereabouts of the gun generally.

Defendant then re-initiated conversation with Deputy Pelfrey and advised that "me and my girl was gonna turn ourselves in" and that they got scared and then she (Ms. Pounds) and he were going to commit suicide, etc. [Gvmt. Exh. 7 at 11]. Deputy Pelfrey responded with a "hm mm." [Id.]. Defendant continued to tell Deputy Pelfrey about his car breaking down, about panicking, about he and Ms. Pounds being suicidal, about him not being able to shoot himself, about calling his friend to come get them, and more. [Id. at 11-13]. Deputy Pelfrey said "Okay." [Id. at 13]. Deputy Pelfrey obtained consent to search Defendant and Defendant's vehicle and said that he needed to square some things away and call the investigator back. [Id.].

After discussing the case with another officer and sharing that Defendant Jones reported that Ms. Pounds shot herself, Deputy Pelfrey asked Defendant a second time about Ms. Pounds and exactly her injury (gunshot wound) was.  [Id. at 17].  The transcript of the body cam audio reads in pertinent part:

> **OFFICER PELFREY:**  He didn't say. I'll ask him. . . . Hey, where'd she shoot herself?
>
> **MR. JONES:** In the back of the head.
>
> **OFFICER PELFREY:** In the back of the head?
>
> **MR. JONES:** I can't -- I can't just demonstrate how I did it -- how she did it, but she had – I'll explain everything.
>
> **OFFICER PELFREY:** This all happened in Georgia?
>
> **MR. JONES:** Yes, it -- no, it happened in Winder.
>
> **OFFICER PELFREY:** Winder?
>
> **MR. JONES:** Yes.
>
> **OFFICER PELFREY:** Okay. Where did you throw the gun out at?
>
> **MR. JONES:** In Winder. I don't know where the hell we was at, but after she did that shit, I was gonna shoot myself, but I was like I don't have enough courage to do that. I don't have the urge to do that, so I just tossed it. Just throw it, you know what I'm saying? Like, it was

stupid. It was stupid on my part. Everything happened in Barrow

County and I was also gonna turn myself in, but the car broke down

so I couldn't get back to Winder. So, I called a friend to come pick me

up and take me back to Winder and he was on his way out here to

come get us and take her to the hospital and then take me back to

Winder. So, I could turn myself in and tell 'em everything that

happened.

[Id. at 17-18].  Defendant Jones' response exceeded the scope of the question.

Deputy Pelfrey advised Defendant of his rights pursuant to <u>Miranda</u>

immediately following these statements.  [Id. at 18-20].  Defendant requested the

presence of an attorney before talking further.

The Court agrees with Judge Fuller that Deputy Pelfrey's questions

attempting to glean information from Defendant concerning Ms. Pounds' condition

and the location of the firearm fall within the public safety exception and are

therefore exempt from the <u>Miranda</u> requirements.  <u>See</u> <u>Quarles</u>, 104 S. Ct. at 2629-

2632; <u>Williams</u>, 784 Fed. Appx. at 710.

Although Defendant argues that there is no "categorical exception" to the

warrant requirement in the Eleventh Circuit for locating firearms [Dkt. 72 at 12-

13], or that a greater threat to the public at large is required before the exception

can apply [Id. at 13-14], the facts of this case readily support application of the exception.  At the time of the exchange between Deputy Pelfrey and Defendant concerning the firearm, Defendant Jones was a suspect in a shooting (potentially a double shooting) and a Ms. Pounds – the alleged kidnapping victim -- had been found in his vehicle bleeding from her mouth and incoherent and Defendant reported that Ms. Pounds had a gunshot wound to the head. Deputy Pelfrey's questions concerning the abandoned firearm were limited to trying to pin down Defendant as best he could on the location of the firearm.  See, e.g., United States v. McRae, 2020 WL 1891749, at *5 (S.D. Ga. Jan. 23, 2020) (holding that officers' questions concerning location, type, and description of gun "fall comfortably" within public safety exception to Miranda), report and recommendation adopted, 2020 WL 755185 (S.D. Ga. Feb. 14, 2020) (citations omitted).

Deputy Pelfrey's questions concerning the nature of Ms. Pounds' injury, while less clear, may also be characterized as "reasonably prompted by a concern for the public safety[.]" Quarles, 104 S. Ct. at 2362.  Deputy Pelfrey's testimony was that he was not intending to interrogate Defendant but merely "checking on [her] status[,]" which is consistent with gathering information for purposes of treatment.  [Hr'g Tr. at 79-80].  Here again, the better practice might have been to read Defendant the Miranda warnings before asking about Ms. Pounds' injury a

second time.  Even so, the circumstances as a whole reflect that Defendant Jones

was voluntarily and spontaneously providing incriminating information to Deputy

Pelfrey in an effort to explain why he did what he did.  At bottom, the conversation

was more casual than coercive, and the subject matter discussed had implications

for Ms. Pounds' safety and well-being (possibly her survival) as well as the safety

of the general public.

For the foregoing reasons, Defendant's objections to the R&R and Judge

Fuller's recommendation that Defendant's pre-Miranda statements do not need to

be suppressed are overruled.

**B. Post-Miranda Statements**

Defendant made the statement to law enforcement that Ms. Pounds shot

herself on two occasions – once prior to the Miranda warning and once after the

Miranda warning.  Defendant contends that his post-Miranda statements repeating

pre-Miranda statements must be suppressed because by the time the Miranda

warning was given, it was "wholly ineffective" and did not make clear that his

previous statements could not be used against him.  See Missouri v. Seibert, 124 S.

Ct. 2601, 2612 (2004) (discussing admitted law enforcement "question first" tactic

designed to elicit suspect confession, give subsequent Miranda warning, and then

secure Mirandized confession).  In the R&R, Judge Fuller opines that Defendant's

19

post-Miranda statements, including that Ms. Pounds shot herself in the head, are admissible.  [R&R at 41, 43].

In this case, unlike the facts in Seibert, the record does not support Defendant's claim that his post-Miranda statements concerning Ms. Pounds shooting herself should be suppressed as a nefarious "question first" strategy employed by Deputy Pelfrey.  See Seibert, 124 S. Ct. at 2612 (affirming suppression of post-Miranda statements).[7]

As detailed by the R&R, most of Defendant's statements were spontaneous and non-responsive to questions or conduct of law enforcement.  Defendant's post-Miranda statements were brief and made to both Deputy Pelfrey and a second officer.  The only questions asked of Defendant related to the nature of Ms. Pounds' injury or the firearm.

The record makes clear that, once advised of his Miranda warning by Deputy Pelfrey, Defendant acknowledged his understanding and invoked his right

_____

[7] In Seibert, the Supreme Court identified factors to consider when evaluating the efficacy of a midstream Miranda warning, including the following:

> [T]he completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first[.]

to counsel in short order.  The Court, therefore, finds that the <u>Miranda</u> warning provided to Defendant was effective.

To the extent Defendant asks the Court to find that his <u>Miranda</u> warning was meaningless, the objection is overruled.

## CONCLUSION

In sum, the Court agrees with Judge Fuller's thorough and well-reasoned analysis.  Defendant's objections concerning admissibility of his statements made in the presence of law enforcement are overruled.

Accordingly, it is hereby **ORDERED** that Judge Fuller's R&R [Dkt. 67] is accepted with approval and **ADOPTED** for all purposes.

It is **ORDERED** that the Motion to Dismiss [Dkt. 28] is **GRANTED** and Count Two of the Indictment is **DISMISSED**.

It is further **ORDERED** that Defendant's Motion to Suppress [Dkt. 41] is **DENIED.**

**SO ORDERED** this 25th day of February, 2022.

**RICHARD W. STORY**
United States District Judge